Filed 5/1/25  P. v. Paiva CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALAGONDRO JAIME PAIVA,<br><br>Defendant and Appellant. | C098734<br><br>(Super. Ct. No. 18FE015279) |

Defendant Alagondro Jaime Paiva appeals from his voluntary manslaughter conviction.  He contends the trial court abused its discretion in declining to impose the lower term.  We conclude that the court's rejection of the lower term was based on the wrong legal standard and we cannot say the record clearly indicates the trial court would have reached the same conclusion under the correct legal standard.  We thus vacate defendant's sentence and remand the matter for a full resentencing.

1

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2018, defendant went to defendant's girlfriend's house to pick her up. Although defendant's girlfriend was not there, Kimauri Washington (victim) and victim's girlfriend were sitting on the front porch. Defendant was aware that defendant's girlfriend and victim had exchanged unfriendly texts a week before. Defendant and victim had a brief conversation, but it was not aggressive.

Defendant returned to his house, where defendant's girlfriend was waiting for him. The two then left for defendant's girlfriend's house. As he drove, defendant noticed victim and victim's girlfriend walking along the street and decided he wanted to talk with victim about the unfriendly texts. Defendant's girlfriend warned him not to, explaining that victim was "not reasonable" and not "a talker," but defendant ignored her and stopped the car.

Both defendant and defendant's girlfriend got out of the car. Defendant's girlfriend approached victim's girlfriend and asked if victim's girlfriend knew that victim had been "disrespecting" defendant's girlfriend. Meanwhile, defendant asked victim, "What's up?" Victim's girlfriend testified defendant appeared angry and was yelling, but defendant's girlfriend said he was not acting aggressively. Victim similarly responded, "What's up?" Victim's girlfriend did not see a knife in defendant's hand when he got out of the car.

The testimony conflicted about what happened next. Victim's girlfriend said defendant punched victim, who tried to punch back but ended up falling. According to victim's girlfriend, defendant then started stabbing victim. In contrast, defendant's girlfriend said victim punched defendant first, leading defendant to back up. Victim continued "charging at him," so defendant pulled his knife out to scare him, but victim still "kept coming." Defendant's girlfriend thought defendant looked scared. Defendant eventually started stabbing victim. Defendant's girlfriend begged defendant to stop, and

2

he eventually did. Soon after the incident, defendant's girlfriend told police that defendant had the knife out before victim "rush[ed]" at defendant.

Victim was bleeding "a lot" as he stood up, walked away from the scene, and then collapsed. Victim suffered two punctured lungs and stab wounds in his chest, arms, hands, abdomen, and right leg, and later died at the hospital from his injuries.

Meanwhile, defendant and defendant's girlfriend fled in defendant's car without calling 911. They treated a cut on defendant's arm and then spent the night in a local motel. Police detained defendant the following morning and found the knife used in the stabbing in defendant's pocket. An officer also found a loaded semiautomatic pistol in the trunk of defendant's car.

Defendant testified he had an unstable family life as a child and moved between different caregivers, including his grandmother and an aunt. In all, he lived in over 50 homes as a child, normally in violent neighborhoods. Defendant's father, who occasionally lived with defendant, was an alcoholic who would physically and verbally abuse defendant. When defendant was about nine years old, defendant's father punched defendant in the face because defendant had tried to intervene in a dispute between his father and a cousin. When defendant was 10 years old, his father again punched him during an argument, even though he had just gotten home from the hospital after being hit by a car and breaking his arm. Defendant's father stopped hitting defendant only when defendant had started to "get bigger" and "hit back" when he was a freshman or sophomore in high school. Other adults also physically abused defendant during his childhood. Defendant also had been beaten up twice as an adult. For protection, defendant started carrying a pocketknife. He also bought a gun that he kept in a shoebox in his house or in the trunk of his car. Defendant's girlfriend did not like defendant carrying the knife because "he had a bad temper." After the incident, she told police, "once [defendant] gets angry there's no stopping him."

3

A clinical psychologist testified on defendant's behalf as an expert in neuropsychology, specifically on the fear response. People who have been repeatedly exposed to bad neighborhoods, physical or emotional abuse, and housing instability would be more likely to experience a fear response. If that physical abuse stopped after a victim started fighting back, that person might be more likely to pair a fighting response with safety. If that person had "encountered something that's been dangerous," it was possible that person would more quickly choose the fight option. "[P]ast experiences of trauma, danger[, or] fear will make it much more likely for the fear response to be initiated. [¶] Once the fear response is initiated, it's all or nothing. It's all about survival. So an individual will do anything in order to survive."

In April 2023, the jury found defendant guilty of voluntary manslaughter (Pen. Code, § 192, subd. (a); further undesignated code sections are to the Penal Code) and found true a deadly weapon enhancement (§ 12022, subd. (b)(1)). The jury found true that defendant was armed with or used a weapon when he committed the crime, but it hung on whether the crime involved great violence, great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness. (Cal. Rules of Court, rules 4.421(a)(1), (2).)

The prosecution asked the trial court to stay the deadly weapon enhancement and impose the upper term of 11 years on the voluntary manslaughter charge. Defendant asked the trial court to impose the lower term given defendant's "severe" childhood trauma, for a total aggregate prison sentence of four years. Probation noted three aggravating circumstances, only one of which was found true by the jury, and three mitigating circumstances and recommended the middle term of seven years plus an additional one year for the deadly weapon enhancement.

During the May 2023 sentencing hearing, the trial court "adopt[ed] the factual representations and findings as set forth in the [probation report] at pages one through

4

seven." Those pages included the three aggravating circumstances and three mitigating circumstances probation identified as applicable.

The prosecution acknowledged defendant had a "horrible upbringing" but argued the psychologist did not testify that was "why this crime occurred. He, essentially, said anybody could have a fight-or-flight response in this situation, and that [defendant's] may have been quicker and more volatile because of his upbringing." So this was not a mitigating factor.

Defense counsel argued defendant had engaged in rehabilitation and self-help while incarcerated, including obtaining his general education diploma and completing programs in victim impact and anger management. But what defendant "truly need[ed]" was mental health treatment for post-traumatic stress disorder. "[H]is mental state was the result of . . . severe abuse and trauma."

Turning to the issue of the appropriate term, the trial court noted the jury had rejected defendant's argument at trial that he acted in self-defense. Although defendant had tried during trial to paint victim as a violent man, the evidence showed it was defendant who instigated the confrontation that led to victim's death. Despite defendant's girlfriend's warnings, defendant stopped the car to confront victim over the unfriendly texts between victim and defendant's girlfriend. The court noted victim's girlfriend had described defendant as acting aggressively when he got out of the car, including yelling at victim. And based on defendant's girlfriend's statement to police soon after the stabbing, the evidence showed that defendant had his knife out when he got out of the car. Also, defendant's girlfriend had asked defendant to stop carrying a knife because he had anger management issues.

The trial court continued: "It may well be that [defendant] suffers from a psychological disorder, the result of his childhood experiences, and that may have triggered the behaviors that transpired after he jumped out of the car and pulled his knife." However, defendant had not submitted any current psychological evaluation.

5

Regardless, the court was obligated to consider whether childhood trauma "may have played a role in the commission of the crime." "In this case, I don't find that childhood trauma experienced by [defendant] contributed to the confrontation that led to the death of [victim] because the set of facts that gave rise to the confrontation was set up by [defendant], as he decided to stop the car in an interest of talking with [victim] in the presence of a knife that [defendant] had on him. . . . [¶] [W]hile I agree that the trauma experienced by [defendant] is a mitigating factor and may give context to the reasons why [defendant] carried a knife, I do not find the trauma alleged greatly contributed to the assault on [victim]. I also don't believe it justifies the low-term sentence sought by the defense given the conduct of [defendant], who orchestrated the circumstances that led to [victim's] death, and . . . who fled immediately after the stabbing and took no steps to call 9-1-1 or assist [victim], who clearly needed help."

The trial court sentenced defendant to prison for the upper term of 11 years on the voluntary murder count "due to the aggravating factors found true in this case." It rejected the middle and lower terms "because the evidence at trial demonstrated that the course of conduct that led to [victim's] death was the result of a calculated decision by [defendant] to confront . . . victim in an aggressive fashion."

After awarding custody credits, imposing fines and fees, and advising on parole and defendant's right to appeal, the court stated it was "going to recommend that [defendant], should he request it, participate in mental health counseling to address unresolved issues from his youth to include, if available and deemed suitable, anger management classes. [¶] [Defendant], you are going to get out relatively soon, actually, and I want to make sure that you receive help to address the problems that are causing you to act out in this fashion."

Defendant timely appealed.

**DISCUSSION**

Defendant contends the trial court abused its discretion in failing to sentence him to the lower term under section 1170, subdivision (b)(6). According to defendant, there was ample evidence he had suffered childhood trauma that contributed to the current crimes. The People counter that the court "did not abuse its discretion in finding that [defendant's] childhood trauma was not a contributing factor in the commission of the offense."[1] We find that the trial court prejudicially abused its discretion and remand for resentencing.

We review a trial court's sentencing decisions for abuse of discretion. (See *People v. Sandoval* (2007) 41 Cal.4th 825, 847.) "A trial court abuses its discretion when it applies the wrong legal standards applicable to the issue at hand." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 85.)

Section 1170, subdivision (b)(6) requires the court to impose the lower term if the defendant has experienced psychological, physical, or childhood trauma that was a "contributing factor" in the commission of the offense unless the court "finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice."

Here, the court made the following statements in rejecting defendant's request for the lower term sentence:

> "It may well be that [defendant] suffers from a psychological disorder, the result of his childhood experiences, *and that may have triggered the behaviors that transpired after he jumped out of the car* and pulled his knife." (Italics added.)

---

[1] We reject the People's initial assertion that the issue was forfeited. Defendant raised the issue by asking for the lower term based on his "severe" childhood trauma, and the trial court considered the issue.

7

"I don't find that childhood trauma experienced by [defendant] *contributed to the confrontation* that led to the death of [victim] because the set of facts that gave rise to the confrontation was set up by [defendant], as he decided to stop the car in an interest of talking with [victim] in the presence of a knife that [defendant] had on him." (Italics added.)

"[W]hile I agree that the trauma experienced by [defendant] is a mitigating factor and may give context to the reasons why [defendant] carried a knife, *I do not find the trauma alleged greatly contributed to the assault on [victim]*. I also don't believe it justifies the low-term sentence sought by the defense given the conduct of [defendant], who orchestrated the circumstances that led to [victim]'s death, and, as mentioned by [victim]'s mother, who fled immediately after the stabbing and took no steps to call 9-1-1 or assist [victim], who clearly needed help." (Italics added.)

As evidenced by these quotes, the trial court found that defendant's trauma (1) did not *greatly contribute* to the offense or (2) *did not contribute to the confrontation that preceded the offense*, but neither is the standard under section 1170, subdivision (b)(6). The standard is lower and requires determining whether the trauma was a "contributing factor." A "contributing factor" (§ 1170, subd. (b)(6)) is less than a "significant factor." (*People v. Banner* (2022) 77 Cal.App.5th 226, 241.) Applying that case law here, a contributing factor is less than a greatly contributing factor or a factor that led to one component of the incident. Based on this record, the court applied the wrong standard.

Where a trial court's sentencing choice was based on an erroneous understanding of the law, remand is required unless the record " 'clearly indicate[s]' " the trial court would have reached the same conclusion under the law as it actually exists. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) Here, the record does not so indicate. The trial court found that defendant's psychological or childhood trauma may or did in fact contribute to defendant's behaviors in this incident. This finding is reflected in the quotes above and in the trial court's statement after imposing the upper term that it

8

(1) recommended mental health counseling to address defendant's "unresolved issues from his youth" and (2) wanted to ensure defendant would "receive help to address the problems that are causing [him] to act out in this fashion."

Nor does the record clearly indicate that the trial court would have found that the aggravating circumstances outweighed the mitigating circumstances such that imposition of the lower term would be contrary to the interests of justice. This conclusion is evidenced by the following statement by the trial court: "I agree that the trauma experienced by [defendant] is a mitigating factor . . . . I . . . don't believe it justifies the low-term sentence sought by the defense given the conduct of [defendant], who orchestrated the circumstances that led to [victim]'s death, and . . . who fled immediately after the stabbing and took no steps to call 9-1-1 or assist [victim]." This is not the weighing required by the statute under the "clearly indicates" standard. The court adopted the three mitigating circumstances probation found true, but the statement above affirmatively indicates that it weighed only one mitigating circumstance. This is not a situation in which we can presume the court properly considered the other mitigating circumstances. (See Cal. Rules of Court, rule 4.409.)

Finally, the record also indicates that the trial court improperly considered aggravating circumstances other than those found true by the jury when it imposed the upper term. (§ 1170, subd. (b)(2); *People v. Lynch* (2024) 16 Cal.5th 730, 755, 757.) The jury found a single aggravating circumstance true, namely that defendant was armed with or used a weapon when he committed the crime. But the trial court did not limit itself to that aggravating circumstance when imposing the upper term. It specifically justified that sentence over a middle or lower term "because the evidence at trial demonstrated that the course of conduct that led to [victim's] death was the result of a calculated decision by [defendant] to confront . . . victim in an aggressive fashion." This was not an aggravating factor the jury found true. And given that the jury specifically hung on whether the crime involved great violence, great bodily harm, or other acts

9

disclosing a high degree of cruelty, viciousness, or callousness, we cannot conclude that the court's reliance on defendant's calculation or aggressiveness was harmless. (*Lynch*, at p. 768 [violation prejudicial unless appellate court can conclude beyond a reasonable doubt that a jury would have found true all facts relied upon by the trial court to justify an upper term sentence].)

For these reasons, we vacate defendant's sentence and remand the matter for a full resentencing hearing. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].) On remand, if the court concludes defendant's trauma was not a contributing factor or imposition of the lower term would be contrary to the interests of justice, the sentence shall not exceed the middle term unless aggravating circumstances justify the imposition of a higher term. (§ 1170, subd. (b)(1)-(2).) Those aggravating circumstances must have been stipulated to by defendant, found true by the jury beyond a reasonable doubt, or be based on a certified record of conviction. (§ 1170, subd. (b)(2)-(3).) Given this conclusion, we need not address defendant's additional argument that the trial court abused its discretion in imposing the upper term because it failed to properly weigh the one aggravating circumstance found true by the jury against what he contends are six mitigating circumstances.

## DISPOSITION

The sentence is vacated, and the matter is remanded to the trial court for a full resentencing hearing. Following resentencing, the trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


                                                /s/
                                                MESIWALA, J.


We concur:


  /s/
MAURO, Acting P. J.


  /s/
DUARTE, J.